[Crim. No. 1642. Third Appellate District.—January 26, 1939.]

THE PEOPLE, Respondent, v. NICHOLAS THEOPHAN ANGELOPOULOS et al., Appellants.

A. J. Carlson for Appellant Angelopoulos.

E. H. Zion for Appellant Krekos.

Gumpert & Mazzera and C. H. Hogan for Appellant Condos.

No appearance for Respondent.

THOMPSON, J.—The defendants were jointly charged, tried and convicted of setting fire to the contents of a store building in Modesto, contrary to the provisions of section 448a of the Penal Code. The defendant, Angelopoulos, also known as Angelo, was also convicted of a second count of the same information wherein it was charged that the defendants attempted to burn the merchandise and equipment of the grocery store with intent to defraud the insurance carrier thereof, contrary to section 450a of the same code. The other two defendants were acquitted of the second charge. Each defendant appeared separately with different attorneys. After conviction their motions for new trial were denied. From the judgment of conviction and from the orders denying the motions for new trial each defendant has separately appealed. The appeals were heard together. For convenience the first-named defendant, who was the owner of the merchandise and fixtures in question, will be referred to as Angelo.

The information contained five counts. The first count charged the defendants under section 448a with burning the store building. The second count charged them, under section 450a, with burning the merchandise, equipment and fixtures contained in the same building, with the intent to injure and defraud an insurance company, to wit: Peoples National Underwriters of Baltimore American Insurance Company. The third count charged an attempt to burn the building contrary to section 451a of the Penal Code. The fourth count charged a conspiracy to commit arson, and the fifth count

charged a conspiracy to burn the merchandise and building to defraud the insurance company.

The last three counts were dismissed. A motion for separate trials of the defendants was denied. The first trial resulted in a disagreement of the jury on December 17, 1937. The case was then set for trial for February 15, 1938. Each defendant appeared in court on the last-mentioned date with separate counsel. The defendants Krekos and Angelo asked for a continuance of the case for their personal convenience. The defendant, Condos, opposed that continuance and announced that he was then ready for trial. He demanded a speedy trial within sixty days from the date of the mistrial of the cause. His objection was overruled and the case was set for trial for May 3, 1938, which was more than a month beyond the sixty-day limitation prescribed by statute. No legal ground for such continuance was attempted to be shown. The defendant, Condos, then promptly moved to dismiss the action as to him, under the provisions of section 1382 of the Penal Code. That motion was denied without a showing of good cause. The defendants were jointly tried on May 3, 1938. Before the jury was impaneled the defendant, Condos, again moved to dismiss the cause as to him for failure to grant him a speedy trial, which was again denied without a showing of good cause. The trial resulted in a verdict convicting the three defendants on the first count. The defendant, Angelo, was also found guilty under the second count. The defendants, Krekos and Condos, were found not guilty on the second count. A separate motion for new trial by each of the defendants was denied. A judgment of conviction was accordingly pronounced against each defendant. From those judgments and from the orders denying their motions for new trial, the defendants have separately appealed.

It is contended the verdicts, judgments and orders denying new trial are not supported by the evidence; that the court erred in receiving evidence at the trial, and in giving to the jury certain instructions. The defendant Condos asserts that he was denied a speedy trial as provided by section 1382 of the Penal Code.

We are persuaded the court erroneously denied the motion of the defendant, Tom Condos, to dismiss the cause against him, under the provisions of section 1382 of the Penal Code, for failure to bring the case to trial within sixty days

from the date of the mistrial thereof, no good cause for a continuance beyond said sixty-day limitation having been shown.

When the defendant has not consented to a continuance of the cause against him, and the prosecution fails to show good cause therefor, upon motion of the accused person it is mandatory upon the court to dismiss the action when more than sixty days have elapsed without bringing the case to trial. Under such circumstances the court has no discretion to deny the motion. (*Matter of Ford,* 160 Cal. 335, 339 [116 Pac. 757, Ann. Cas. 1912D, 1267, 35 L. R. A. (N. S.) 882]; *People* v. *Morino,* 85 Cal. 515 [24 Pac. 892].) Article I, section 13, of the Constitution of California guarantees an accused person a speedy trial. That constitutional provision is construed by section 1382 of the Penal Code to limit the time within which the trial must be had to a period of sixty days, unless by the defendant's conduct or acquiescence he consents to extend that time, except when the business of the court, the illness of the judge, or some other good reason for delay prevents the trial during that period of time. In the case of *Ford* v. *Superior Court,* 17 Cal. App. 1 [118 Pac. 96], it is said:

" 'The statute is a construction of the constitutional provision so far as to indicate what is a reasonable time within which the case should be brought to trial in order that the constitutional guaranty may be kept; and it may be fairly interpreted to mean that this guaranty is violated whenever sixty days is allowed to elapse without a trial, there being no good reason for delay and the defendant not consenting thereto. It is sufficient for the defendant, in order to make out his case upon a motion for a dismissal in the trial court, to show that he has been detained without a trial for more than sixty days.' "

Where there has been a trial and a failure to determine the guilt or innocence of an accused person, the time for another trial begins to run from the date of the mistrial. In 8 California Jurisprudence, page 203, section 277, it is said in that regard:

"The rule in California is that the defendant must be brought to trial the first time within sixty days after the finding or filing of the indictment or information, and thereafter within sixty days from the first trial, if that trial results in a disagreement of the jury, or within sixty days after the

return of the *remittitur*, if a new trial be awarded by an appellate court.''

In the present case the three defendants were jointly charged with the crimes. They appeared separately by different attorneys. The defendant, Condos, demanded a separate trial, which was refused. The cause was tried and resulted in a disagreement by the jury on December 17, 1937. The case was again set for trial for February 15, 1938, within sixty days from the mistrial. The defendant, Condos, was present in court on the last-mentioned day with his attorney ready for trial. The other defendants and their respective attorneys were also present in court at that time. These last-mentioned attorneys then moved for a continuance of the trial to a date beyond sixty days from the mistrial, to wit, on May 3, 1938. That motion was made solely for the accommodation of two of the defendants, Krekos and Angelo. The defendant, Condos, specifically objected to continuing the trial to a time beyond sixty days from the date of the mistrial.

His objection was overruled and the trial was set for May 3, 1938. No reason for the continuance of the trial was assigned, except that it was granted for the convenience of the other two defendants. It is not contended the pressure of court business, the illness of the judge, or any necessary accommodation to the court was the reason for granting the continuance. Yet, for the convenience of two defendants, the third defendant was denied a speedy trial. The defendant, Condos, promptly moved the court under the provisions of section 1382 of the Penal Code to dismiss the action against him. The motion was denied without a showing of cause therefor. On May 3, 1938, when the cause was finally called for trial, the defendant, Condos, appeared in court with his attorney and again moved to dismiss the action against him for failure to award him a speedy trial. That motion was also denied without cause having been shown justifying the continuance beyond the sixty-day period of limitation. The defendant was then forced to trial which resulted in a verdict of conviction of the charge contained in the first count of the information. From that judgment he has appealed.

It is not necessary for the defendant to affirmatively show that he was prejudiced by a continuance of trial beyond the sixty-day period prescribed by statute. The constitutional

provision and section 1382 of the Penal Code absolutely guarantee an accused person a speedy trial unless good cause for denying it is first shown. Prejudice to the defendant is presumed from the violation of that guaranty. The burden is on the prosecution to show good cause for the delay when a motion for dismissal of the action is made on that account. (*Harris* v. *Municipal Court*, 209 Cal. 55, 64 [285 Pac. 699].)

The validity of the order denying a defendant's motion to dismiss a criminal action against him for failure to award him a speedy trial, may be challenged on appeal from a judgment of conviction. The order refusing to dismiss the information is not separately appealable. It may be reviewed on appeal from a subsequent judgment of conviction. (*Matter of Ford*, 160 Cal. 334, 348 [116 Pac. 757, Ann. Cas. 1912D, 1267, 35 L. R. A. (N. S.) 882]; 8 Cal. Jur. 209, sec. 280.) The continuance of a trial beyond the statutory limitation of time, over the objection of a codefendant, for the mere convenience of his associate, is a denial of a speedy trial to the objector, and under such circumstances, upon his motion under section 1382 of the Penal Code, it is mandatory for the court to dismiss the action against such objector.

It is claimed by the defendant, Angelo, that there is a fatal variance between the allegation of the second count of the information and the proof with relation to the identity of the fire insurance carrier, which it is charged the defendants sought to defraud. It is also asserted the information is fatally defective for failure to allege that the fire insurance carrier was in fact a corporation.

There is no merit in these contentions. The information charges in ordinary and concise language that the defendants burned the property with the intention of defrauding the insurance carrier, "Peoples National Underwriters of Baltimore American Insurance Company".

It has been held the information should allege that the company is a corporation, if that be a fact. (*People* v. *Schwartz*, 32 Cal. 160.) That case, however, was decided in 1867, under the comparatively strict provisions of the Practice Act. Since the enactment of the more liberal provisions of sections 950–956 of the Penal Code, regarding the essential allegations of a criminal charge, we are of the opinion it is

no longer necessary in charging a violation of section 450a to state that the fire insurance carrier is a corporation, provided it is adequately identified. Section 956 of the Penal Code provides that:

"When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, *an erroneous allegation as to the person injured,* or intended to be injured, or of the place where the offense was committed, or of the property involved in its commission, *is not material.*"

Section 450a makes it a felony to burn property "with intent to injure or defraud the insurer . . . whether the property of himself or of another, which shall at the time be insured by any person or corporation against loss or damage by fire". The purpose of the statute is to prevent the destroying of property by fire for the purpose of enabling the insured to fraudulently collect the insurance from the carrier thereof. The gist of the offense is burning the property with an intent to defraud the fire insurance carrier. The offense is just as grave a violation of law whether the fire insurance carrier be an individual, partnership, company or corporation. In 6 Corpus Juris Secundum, page 748, section 28 (2) c, it is said in that regard:

"In the statutory crime of burning insured property, an allegation that the property was insured in a particular company is immaterial to the state's case, and so proof that the property was insured elsewhere does not constitute a fatal variance."

It is sufficient under our present liberal procedure to allege and prove under the provisions of section 450a that the fire insurance carrier is a *de facto* corporation. (*People* v. *Morley,* 8 Cal. App. 372 [97 Pac. 84]; *People* v. *Hughes,* 29 Cal. 257; 6 C. J. S. 748, sec. 28 (2) c.) In the Morley case, in which a hearing by the Supreme Court was denied, it is said:

"Proof that it was a *de facto* corporation and acting as an insurance company is sufficient."

In 6 Corpus Juris Secundum, above cited, the author of the text says:

"Where the indictment alleges that insurer of the property burned is a corporation, proof that such corporation is a corporation *de facto* is sufficient and not variant, and, like-

wise, where it is unnecessarily averred that the insurer was a corporation, evidence establishing a *de facto* corporate existence is sufficient.''

The information was not fatally defective for failure to specifically allege therein that the insurance carrier was a corporation.

The evidence sufficiently supports the allegation of the information with respect to the existence of insurance against loss by fire, and the identity of the insurance company. Harry R. Windus testified that he was the Modesto insurance agent for the Peoples National Underwriters of Baltimore American Insurance Company, which is mentioned in the information as the carrier of the fire insurance on the property in question. He said that he insured the merchandise in that store with his company December 4, 1937, for $3,000, and he insured the fixtures for an additional $2,500. He identified his insurance company by name as the same one which is designated in the information. As proof of that insurance a so-called ''cover note'' for the character and amount of insurance above mentioned was offered in evidence. The agent explained that the cover note was executed and delivered to the insured to guarantee the liability and terms of the contract of insurance pending the issuance of the formal policy by the company. It was a binding temporary contract of insurance. There is no doubt the company named in the information was the insurer against loss by fire of the merchandise and fixtures in the store at the time of the fire.

It is true the information should allege that the insured property was burned ''with intent to injure or defraud the insurer''. It is insufficient to merely allege that the property is insured. There are various classes of insurance. Property may be insured against earthquakes, tornadoes and other calamities. The section in question merely forbids the burning of property to defraud an insurer thereof against fire. Count two of the information, however, fully meets that requirement. It charges the defendants with burning the property with intent to defraud the carrier of insurance thereon. It concludes, after describing the burned property, by reciting that the property ''was at said time insured by Peoples National Underwriters of Baltimore American Insurance Company, *against loss or damage by fire''*. That is

an adequate definite assertion that the insurance in question was for the purpose of indemnifying the owner against loss or damage by fire. It is therefore sufficient in that regard.

■ The admission in evidence of the statement of the defendant, Angelo, over his objection was erroneous. That ruling, however, does not constitute reversible error for the reason that the statement does not appear to contain any material admission in conflict with the testimony which he gave at the trial. It was taken by the district attorney with the aid of his stenographer, shortly after the defendant's arrest. It was recorded in shorthand and transcribed into longhand. It was a competent statement to have been received as a part of the prosecution's evidence in chief. But it was offered in rebuttal for the evident purpose of impeaching him after the defendant, Angelo, had been cross-examined. On cross-examination Angelo was asked if he did not leave keys to the front door of his store on his desk for his clerk, Pete Krekos. Over objection that it was not proper cross-examination, he replied that he did leave the keys on his desk, but that he did not tell Pete they were there, nor did he say he had left them *for him*. He was not asked if he had previously made a contrary statement to the district attorney. The foundation for his impeachment on that subject was not laid. When the stenographer was subsequently called to the witness stand and interrogated regarding the contents of that statement, the objection was formally made that the record was incompetent since no foundation was laid for its introduction, and that the defendant was entitled to see the transcript and have his attention called to the alleged discrepancy. The objection was overruled, and the entire statement was read into the record from the stenographer's shorthand notes. No motion was made to receive the evidence as a statement of defendant's admissions on the prosecution's case in chief. If it was received for impeachment purposes, clearly the defendant was entitled to have his attention first called to any alleged conflict of testimony. (Sec. 2052, C. C. P.) It does appear that it was a voluntary statement of the defendant. As such, it should have been offered as a part of the prosecution's case in chief. However, it appears to contain nothing in substantial conflict with his testimony adduced at the trial. In the challenged statement the defendant said in effect that he had two sets of keys to

the front door. of the store; that when he went away he gave one set to Pete Krekos, and that he placed the other set "on the desk, I left them by some papers. Q. Did you say anything to Pete about leaving the keys on the desk? A. I says to Pete or Miles, I don't know which,—'There's the keys, if you open up yourself.'" The discrepancy in the evidence is trivial. Angelo admitted he left a set of keys with Pete Krekos. The only significance of this evidence is the question as to whether he also left the other set of keys for the use of the clerk Condos. It seems to be immaterial.

While the ruling which admitted the statement in evidence was technically erroneous, we are unable to say it was prejudicial or reversible error.

■ It was prejudicial error for the assistant district attorney, on cross-examination, to ask a character witness called in behalf of the defendant Condos if he had ever heard of the defendant being charged with white slavery. (*People* v. *Wells*, 100 Cal. 459 [34 Pac. 1078].) There is no evidence that that question was asked in good faith. After much controversy and argument over the matter the court instructed the jury to disregard it. We assume the effect of that insinuation was prejudicial.

Harold R. Hoff, an insurance agent who had lived in Stockton for thirty years, testified that he had known the defendant Condos for nine years and that his general reputation for truth and honesty was good. On cross-examination, the first question the assistant district attorney asked the witness was, "Have you ever heard of Mr. Condos being arrested on a white slave charge?" There was no effort to justify the asking of that question. In a case of this nature, based wholly on circumstantial evidence, with unsatisfactory proof of the guilt of the defendant, such unfair questions may be very harmful. We do not infer that erroneous question standing alone would constitute reversible error, provided we could say there was not a miscarriage of justice in this case. But upon reading the record in this case, we are unable to so hold.

■ The defendant Angelo insists that the verdicts are inconsistent and irreconcilable. The objection appears to be well taken. We are unable to reconcile the verdicts. The three defendants were convicted of burning the property contrary to section 448a. The evidence is uncontradicted that

Angelo was not present when the fire was started. The prosecution concedes that fact. He was then in San Francisco. The theory of the prosecution is that Angelo hired Krekos and Condos to burn the property. If they did burn the property for pecuniary reward, they acted as his agents. But having participated in burning the property to defraud the insurance company for the benefit of their employer, they became principals and were equally guilty with Angelo of burning the property to defraud the insurance company, under section 971 of the Penal Code. Yet the jury convicted Angelo under the second count, but acquitted those who are alleged to have actually performed the job. If Krekos and Condos were not guilty of violating section 450a, certainly Angelo could not be found guilty of that offense, for the only possible theory of the prosecution is that the clerks actually performed the job. The verdicts on the second count of the information are inconsistent and irreconcilable. It is, therefore, necessary to reverse the judgment against Angelo on the second count of the information.

 After a careful review of the record, we are of the opinion the verdicts and judgments are not supported by the evidence. The evidence is entirely circumstantial. Every circumstance of the case is reasonably reconcilable with the theory of the innocence of the defendants. The most that may be said of the evidence in this case is that some circumstances may tend to create suspicion that the defendants may have set the fire. In arson cases, based wholly on circumstantial evidence, it has been held that over-insurance of the property sought to be burned, supported by other incriminating circumstances, may be sufficient to support a judgment of conviction. In the present case, however, the property was not insured for more than its reasonable value. It was insured for considerably less than its value. The defendant, Angelo, had just spent $2,500 in installing new shelving, counters and fixtures and in remodeling the front of the building in preparation for conducting a grocery business. He held a ten-year lease on the property on easy terms. He had sublet one-third of his floor space to a reliable butcher for two-thirds of the cost of his rental for the first three years. He was not bankrupt. He still had deposited to his credit in the bank nearly $500. He had been operating the store only twenty days at the time of the fire. A merchant's hope

for success should last longer than that. It is unreasonable to assume a merchant would attempt to burn his stock of goods and store under such circumstances. The other defendants had absolutely no motive to burn the store, unless they were hired by the owner to set the fire. There is no substantial evidence of that fact. Their conduct refutes that theory.

The strongest arson case which we find reported similar to the circumstances of the present cause, in which a judgment of conviction was sustained, is *People* v. *Patello*, 125 Cal. App. 480 [13 Pac. (2d) 1068]. That case is distinguishable from this one in several essential particulars. The defendant, Patello, and his sister lived in a two-story building which he purchased on a contract. He owned only a $1500 interest in the building. He was delinquent in his payments to the extent of $300. The value of the building was less than $2,000. He carried insurance on it in the sum of $3,000. The value of the furniture did not exceed $600. His sister carried insurance on the furniture in the sum of $1500. The property was over-insured. The night of the fire the defendant went away. His sister went to the home of a neighbor for the night. He knew she had done so. Yet after the fire he denied that he knew his sister was absent from their home. The doors and windows of the house were all closed and locked. The curtains had been drawn. Fires had been built and started in three different rooms. Some furniture, debris and floors were saturated with kerosene oil. The over-insurance, the alleged absence of the defendant and his sister from their regular dwelling place, the careful preparation for the fire in three rooms, the inaccessibility of the house to strangers, the drawing of the curtains, and the denial that the defendant knew where his sister had gone for the night, are incriminating circumstances which distinguish that case from this one, and which warranted the court in sustaining the judgment.

In the present case the defendant Angelo had a credit in the bank in July, 1937, of $3,700. He planned to conduct a grocery business at Modesto. For that purpose he leased a large one-story brick building for ten years at $65 per month for the first two years; at $75 per month for the following two years and at a gradual increase of rent thereafter. He sublet one-third of the floor space for the term

of three years to a reliable butcher by the name of Thomas Green, for $45 a month. Angelo bought a new refrigerator for $945 on instalments of $23.45 per month. He paid $170 cash toward the purchase price of that box. He also bought a cash register for about $500, on instalments of $18 per month, upon which he paid $35 cash. He bought a new stock of high-class groceries and merchandise, appraised at about $4,000, upon which he paid $1800 cash. It was conceded their retail value was $4,100. He installed in the store shelving, counters and fixtures at an expense of several hundred dollars. The stock was neatly arranged on shelves and counters. He remodeled the front of the store at a cost of $400. He was not delinquent in the payments of rent, instalments or otherwise. He still had cash in the bank in excess of $500 and some securities. He was advertising liberally in several newspapers. His stock of merchandise was insured for only $3,000 and the fixtures, which were appraised at $3,000, were insured for $2,500. He had been operating the store less than three weeks at the time of the fire. Except for the first few days, he was not conducting a profitable business. The day of the fire he took in $83 from sales of goods. He had not complained of a lack of business. There is no evidence of his discouragement because of poor business. His preparations for a substantial mercantile business at a cost of nearly all the money he possessed, the careful, orderly and business-like arrangement of his stock, the subletting of a portion of his floor space upon good terms, and elaborate advertising of the business in newspapers, and substantial, though not yet profitable, bulk of sales, render unreasonable the theory that in less than three weeks he lost hope of success and planned to burn his stock to recover insurance which would leave him a total loss of two or three thousand dollars. Without more tangible and incriminating evidence than this record contains, that theory of the guilt of the defendants does not appeal to reason.

The front of the store building was equipped with four pair of double doors to permit the entire front to be opened for display and business. The upper portions of these doors contained glass windows. Most of the doors were fastened on the inside with padlocks. There was one double door on the side of the building, in the alley. There were two windows in the rear of the building and several in the side walls.

These windows were located four or five feet above the ground, and most of them were screened.

After the fire occurred a crate was found leaning against the wall beneath the window at the rear of the building, indicating that someone had made an effort to enter the building by that means. The screen over that window was, however, found closed. Immediately after the fire was discovered, the side door was found open. It was usually fastened by a bar on the inside. It is reasonable to assume someone may have found the screen over the rear window open, and after entering the building in that manner the screen may have been closed on the inside and the side door opened as a quick and secret way of escaping into the alley after the fires were set. At least there is undisputed evidence that the crate was deliberately placed beneath the rear window.

The defendant employed the two co-defendants as clerks. The good reputation of one of them was vouched for by several reputable witnesses from that community. There were also two boys employed as helpers in the store. Both of them left the store, as usual, quite early on the night of the fire. 'One of the boys was attending a scout meeting. It is conceded the defendant Angelo drove to San Francisco the afternoon of the fire. He said that he went down there to consult the Greek consul about disposing of some collaterals which he owned. That fact is not disputed. Before leaving for San Francisco he gave one set of store keys to one of the clerks and left the other keys on his desk. It was the duty of the clerks, Krekos and Condos, to open the store early each morning. They were expected to remain in the evening until about 9 o'clock. Condos lived twelve miles south of Modesto. Krekos lived in town and ate his meals at a restaurant.

On the night of the fire, August 23d, Krekos and Condos were about the store until 9:20 o'clock. They were seen there by a druggist who conducts a business near by. They spent some time that evening, washing the store windows. Mr. Green, the butcher, remained in the store until 8:30 P. M. that night. He talked with the co-defendants and was told that Angelo had gone to San Francisco. He said they told him the keys had been left with which to open the store in the morning. He related no suspicious circumstances or conduct on their part indicating preparation for the setting

of the fire. He used a telephone in the back room and knew a can of floor oil was kept there for use. After the fire occurred, a small box containing a number of newspapers was found in the store. Green testified that it was not there before he left the shop that night. There is no proof that any of the defendants subscribed for any of those newspapers. Their presence was not accounted for.

Krekos and Condos closed the store at 9:20 that night. Their conduct was observed by others, and no stealth or suspicious evidence of preparation for a fire was observed. The building was apparently accessible to others from the outside. The side door was found open when the firemen arrived. Before leaving the store that night, Krekos placed the receipts of the day's sales, consisting of checks and cash amounting to $83, in a sack, and hid it in a box on a shelf in the store. They were seen by a druggist inside the store just before they left. No suspicious circumstances are related. They put out the lights, went out the front door, locking it behind them, and stood in front talking for a few moments. They then drove away in the automobile owned by Condos. He left Krekos at a restaurant where he calmly ate his supper. Condos drove to his home twelve miles south of town. At 10:18 o'clock, about one hour after they left the building, a fire alarm was heard. Krekos was told of the fire and rushed to the store, where he found the firemen engaged in extinguishing the fire. He boldly entered the front door and walked to the place where he had hidden the sack of money. He openly took the sack in his hand and started to walk out with it. A fireman asked what he had in the sack, and he replied that it was the cash receipts of the day which he had hidden there. It was promptly taken from him.

When the firemen arrived they found accumulations of pasteboard boxes, crates, toilet paper and other inflammable materials, which had been saturated with oil, piled in five different places in the store, in each of which piles fires were blazing. Burned matches and oiled rags were scattered about. There is no doubt the fire was of incendiary origin. That fact was conceded at the outset of the trial. There was ample time for an outside stranger to have entered the building and set the fires after the clerks were seen to leave for the night. The fires were soon extinguished after considerable

damage had resulted from both the fires and the water which was applied.

After the arrest of the defendants, it is perfectly natural for one to say, "If they did not set the fire, who did?" But it is not incumbent on the defendants to produce the culprit. The identity of that individual may be as much of a mystery to them as to others. Mystery fires are common. The defendants are entitled to a reversal of the judgment unless their guilt was established according to the rules of criminal law.

It is improbable that men who were planning to burn a stock of merchandise for financial reward would frankly disclose the planned absence of the proprietor, consume their time in the useless job of washing windows, and deliberately leave in the store a sack containing $83 to be destroyed in the fire. Such conduct is not consistent with the guilt of the clerks. It is equally improbable that a man who had just deliberately started a fire to destroy the store, would rush directly to the burning building and boldly walk into the very presence of the firemen who were engaged in extinguishing it, and openly take the sack of money to remove it. That is not the act of a guilty man. A man who planned such a crime for financial profit would certainly take the sack of money with him when he left after starting a fire with the purpose of destroying the building.

The morning following the fire, Condos returned to town and went to a restaurant to order a lunch, according to his usual custom. He was asked what he wanted a lunch for, since there was a fire at his store the previous night. He was apparently surprised to hear of the fire. That was evidently the first information he had of the fire. There was nothing in his manner or conduct to indicate that he had previous knowledge of the fire or that he had participated in starting it. Several reputable citizens of that community testified to the previous good reputation of Condos.

One incident is cited by the prosecution as evidence that Angelo hired his clerks to set the fire. When he went to San Francisco he withdrew from the bank $250. When he reached the city he called Krekos about 9 o'clock on the telephone and asked him how everything was going. Angelo, however, brought back with him all the money he drew from his bank account except $90, which he spent in the payment of bills. He said that he called Krekos just to be satisfied the

business was being conducted properly in his absence. It was Krekos, himself, who told of the telephonic communication from Angelo. The conduct and explanations of the defendants regarding every circumstance seem inconsistent with the theory of their guilt. There is no substantial conflict in their evidence. It is conceded Angelo was not present and he did not personally set the fire. The circumstances and conduct of his co-defendants indicate strongly that they did not do so. It seems unreasonable to assume that the owner of a store would delegate to his clerks a job so dangerous to his liberty. The theory that he hired his clerks to perform that job during his absence is purely speculative. There is no evidence that he paid them money, or that he promised to reward them for that act. He did withdraw from his account in the bank $250 when he went to San Francisco, but he brought most of that money back with him when he returned. To affirm the judgment in this case on such unsatisfactory evidence would be going far beyond any similar case that has been called to our attention. We are persuaded the verdicts of conviction in this case were the result of prejudice against unwelcome members of an alien race.

The judgments and the orders are reversed as to each appellant. The court is directed to dismiss the action against the defendant Condos, and to grant the motions of the other defendants for new trial, setting the case against them for retrial on the first count, if the court is so disposed.

Pullen, P. J., concurred.