Filed 4/16/13  P. v. Robles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CESAR NAVARRO ROBLES,<br><br>    Defendant and Appellant. | F063062<br><br>(Fresno Super. Ct. No. F01601574)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# I.

## INTRODUCTION

Defendant was charged with attempted murder (Pen. Code, §§ 664 & 187, subd. (a)) (count I) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) (count II). The prosecutor tried defendant on the theory that he aided and abetted his brother's attempt to murder Bernardo Ramirez (Ramirez). A jury convicted defendant of both counts. Defendant contends that (1) the trial court erred by not instructing the jury on attempted voluntary manslaughter and (2) that there was insufficient evidence to support his attempted murder conviction. We disagree and affirm.

# II.

## FACTS

### A. PRIOR INCIDENTS

The events giving rise to the charges against defendant occurred on September 26, 2010. Both Ramirez and defendant testified regarding their interactions before that date.

#### 1. Ramirez's Testimony Regarding Prior Incidents

Ramirez testified to the following prior incidents. In October 2007, Ramirez was in his backyard to cut his lawn, when a dog "came out at" him. Pedro, defendant's brother, was the only person standing nearby. Ramirez asked Pedro if he knew whose dog it was. Pedro responded, "Who do you think the 'F' I am, an investigator?" Eventually, Pedro "went inside"[1] and "came outside" with a gun. Ramirez called the police. Afterwards, defendant drove by Ramirez's house, called him a "rat," and said that he "was gonna get it." Defendant repeatedly chased and threatened Ramirez thereafter. Ramirez and defendant also had a "verbal altercation" at a Texaco station, but no one was hurt.

---

[1] The testimony does not indicate where Pedro went.

Defendant also tried to run Ramirez over with a vehicle approximately 12 times. Ramirez described one such incident as follows:  Ramirez rode his bicycle to a store. Before entering the store, Ramirez noticed defendant's truck outside.  Ramirez went into the store for approximately seven to eight minutes and then began to ride his bicycle home.  Defendant followed him.  Defendant's vehicle veered into Ramirez's lane of travel coming within two feet of him.  Defendant said "f**king rat" as he passed Ramirez.

Ramirez also described another prior incident, which occurred three days before the events of September 26, 2010.  Ramirez was returning home from his daughter's house on his bicycle.  Ramirez tried to cross a street behind defendant's truck.  Defendant put his truck into reverse and attempted to hit Ramirez.  Ramirez rode his bicycle onto the sidewalk to get out of the way.  Ramirez headed back towards his daughter's house, and defendant did not follow.

Ramirez testified that the prior incidents were "similar in nature."

### 2.  Defendant's Testimony Regarding Prior Incidents

Defendant testified about an incident at a Texaco station in Orange Cove. Ramirez took defendant's cellular telephone and wanted defendant to "step outside to fight."  Defendant did not engage.

Another time, defendant was in an auto parts store when Ramirez entered and "wanted to fight."  Defendant did not fight with Ramirez because he was "scared of him."

Defendant testified that he had never tried to run Ramirez over with his truck.

### B.  THE EVENTS OF SEPTEMBER 26, 2010

#### 1. Ramirez's Account

Ramirez testified to the following account:  On the morning of September 26, 2010, Ramirez rode his bicycle to a donut shop near his house in Orange Cove.  When he arrived at the donut shop, he left his bicycle outside near a window.  He entered the donut shop and saw defendant and defendant's friend, Andy Garcia.  Defendant said to

3.

Ramirez: "I don't want no problems." Ramirez responded, "Cool," and walked towards the area where coffee is made. Ramirez heard defendant, on the phone, say: "Hey brother, um, he's here." Ramirez purchased a coffee and put creamer "and everything" in it, by which time defendant and Andy were outside near a vehicle with its doors open.

While Ramirez was still inside the donut shop, Pedro arrived in a truck. The donut shop's owner told Ramirez not to go outside. Pedro grabbed Ramirez's bicycle and threw it in the back of his truck. Ramirez went outside to get his bicycle back.

Defendant and Pedro approached Ramirez and started swinging at him. Defendant hit Ramirez first, and Ramirez tried to swing back. Pedro was also hitting Ramirez. Defendant said, "Let's f**k him up, let's f**k him up." Ramirez hit defendant, who fell to the ground. Defendant grabbed Ramirez's legs. Pedro ran back to his truck and grabbed a machete. Ramirez was "maybe" "a good 50 feet from the truck" and tried to get away. But, defendant continued to hold on to his legs. As Pedro was returning from the truck, defendant said, "F**k him up, f**k him up." Pedro raised the machete over his head and ran towards Ramirez. Pedro got close to Ramirez and swung the machete, hitting Ramirez in the head. Ramirez fell to the ground, and Pedro repeatedly hit him with the machete. Ramirez covered up into a fetal position to protect his vital areas. Pedro hit Ramirez "about six" times with the machete, striking him on his head, back, arm, and legs. Defendant kicked Ramirez multiple times in the head while he is on the ground. Ramirez lost consciousness. When he regained consciousness, Pedro and defendant were gone.

2. Defendant's Account

Defendant testified that he and Andy went to the donut shop. Ramirez entered the store sometime after. Ramirez said that he wanted to fight with defendant and told him "to step outside." Defendant replied that he did not want any problems, and he did not want to fight. Defendant never called his brother while inside or outside the donut shop. As defendant was leaving the donut shop, Ramirez said, "You'll see."

4.

Defendant went to his vehicle preparing to leave when Ramirez exited the bakery and attacked him. Defendant tried to cover himself for protection. Defendant could not defend himself because Ramirez dropped the defendant to the ground and started kicking him. Defendant grabbed Ramirez's legs to stop the kicking, and Ramirez fell on top of him. At some point, defendant's brother Pedro arrived. Defendant did not see Pedro arrive nor did he speak to him. Defendant initially testified that he did not know what Pedro did, but later testified that Pedro hit Ramirez. Defendant did not know whether Pedro had anything in his hands because defendant was on the ground. The fight ended as defendant got up, and he and Pedro left. Prior to getting up, defendant never saw Ramirez with a weapon. Defendant was unsure as to whether or not he himself ever hit Ramirez. Defendant denied helping Pedro beat Ramirez or saying, "F**k him up, f**k him up."

Defendant suffered injuries to his head, chest, right thigh, right hip and a tooth. The injured tooth was extracted.

### 3. Nancy Almanza's Testimony

Nancy Almanza (Almanza) was a bakery[2] employee working on September 26, 2010. She observed defendant come into the store and buy some bread. "Someone" else came in and said something to the effect of, " 'Hey are you looking for me?' " Defendant responded, " 'I'm not saying anything to you. I'm not saying anything to you.' " Defendant paid and left the bakery. The other person got coffee quickly and went outside. Almanza did not see what happened outside the bakery.

---

[2] Witnesses Almanza and J. Guadalupe Perez Martinez refer to the establishment as a "bakery" while the victim and defendant refer to it as a "donut shop." The record is clear that they are one and the same.

### 4. J. Guadalupe Perez Martinez's Testimony

J. Guadalupe Perez Martinez (Martinez) was the owner of the bakery. Martinez observed two young men paying when another arrived. "[W]ords were exchanged," so Martinez told them he did not want any fights in the store. One of the men went to the coffee station and then said to Martinez: " 'me by [*sic*],' " and then said, " 'bicycle.' "[3] Martinez did not understand what he was saying. The man then said, " 'Call them,' " and Martinez responded, " 'Who?' " The man said something about "police" and then left the bakery. Martinez went to the door and saw two men fighting outside. A third man was trying to separate them. Martinez ran inside and grabbed his telephone to call the police. He did not see "what happened with the fight …." He eventually saw "the young one" bleeding and sitting down. He spoke to the injured man while still on the line with "the police dispatcher." A recording of the call was played at trial. Martinez was asked whether the recording fairly and accurately represented the conversation he had with law enforcement. Martinez responded affirmatively.

The trial court read the translated transcript of Martinez's call into the record as follows[4]:

" 'Dispatcher 2: Thank you.

" 'Dispatcher 1: Could you please (unintelligible)

" 'Caller: … "I was here at the bakery on the corner of Martinez and of – of Celaya."

" 'Dispatcher 2: … "And what is happening?"

" 'Caller: … "Well, they're fighting. They're beating someone."

---

[3] Contextually, it is clear that Martinez was referring to Ramirez.

[4] The parties agreed that the translation was substantially accurate. . The only omissions from the Reporter's Transcript pertain to translation-related notations (e.g., "(A statement in Spanish, translated as)" and are signified by ellipses.

" 'Dispatcher 2: … "On Martinez and (unintelligible.)"

" 'Caller: … "They are beating him, yes, please come soon."

" 'Dispatcher 2: … "And how many are fighting? Who is fighting?"

" 'Caller: … "They are beating a man, it's three against one."

" 'Dispatcher 2: … "It's three?"

" 'Dispatcher 2: … "Do they have weapons?"

" 'Caller, [*sic*]: … (unintelligible.) "One. One has a machete, but I don't know who it was, but they left already. But hurry or else they're going to (unintelligible.)"

" 'Dispatcher 2: … "Okay. The police is [*sic*] now on their way. Okay."

" 'Caller: … "The police is [*sic*] on their way." ' "

On cross-examination, Martinez testified that it was a "one-on-one" fight, not three against one. The third man was trying to separate the two fighting men.

On redirect examination, Martinez testified that he did not remember if he personally saw a machete or big blade, or whether he was just relaying information given to him by the injured man.

### C. THE EVENTS OF SEPTEMBER 27, 2010

#### 1. Sergeant Jesus Rivera's Account

Sergeant Jesus Rivera was a patrol sergeant for the City of Orange Cove. On September 27, 2010, Sergeant Rivera responded to a residence south of Orange Cove to "attempt pick up of a suspect" in the donut shop incident. They held posts at the residence for a few minutes when one of the officers saw someone in a window of the residence. A few seconds later, an individual later identified as defendant ran out of the residence, looking at the officers behind him. Sergeant Rivera and another officer were able to make contact with defendant. Sergeant Rivera believed the initial name provided by defendant was "Jose Avila." Approximately 10 minutes later, defendant told Sergeant Rivera his true name.

### 2. Defendant's Account

Defendant testified that on September 27, 2010, he was at a house on a ranch. He heard dogs barking and stepped outside to see what was happening. When he exited, the police were there and told him to drop on the ground. Defendant dropped to the ground and did not run from police. Defendant believed that Sergeant Rivera was lying when he testified that defendant ran from the house. Defendant admitted to giving police "another name," but eventually told them his correct name.

### D. INSTRUCTIONS

Once the prosecution and defense both rested, the trial judge discussed jury instructions with counsel outside the presence of the jury. The judge stated, "Clearly based on defendant's testimony there would not be enough evidence to support an attempted voluntary manslaughter. He claims neither that he was acting under the heat of passion nor that he was acting in response to a perceived threat that would justify use of deadly force. At least that would be my perception as to a possible lesser to Count 1." The judge discussed additional instructions and then said, "So that is my revised tentative." The judge asked whether the defense wished to be heard and defense counsel responded, "No, thank you, Your Honor."

The court instructed the jury on aiding and abetting liability, attempted murder, assault, assault with a deadly weapon, and perfect self-defense to the assault and assault with a deadly weapon charges. The court did not instruct on attempted voluntary manslaughter on either heat of passion or imperfect self-defense theories.

### E. VERDICT AND SENTENCE

The jury found defendant guilty of attempted murder and assault with a deadly weapon. Defendant was sentenced to seven years in prison on the attempted murder count. The court sentenced defendant to three years in prison on the assault with a deadly weapon count and stayed the sentence pursuant to Penal Code section 654.

# III.

## THE TRIAL COURT DID NOT ERR IN OMITTING A LESSER INCLUDED INSTRUCTION ON ATTEMPTED VOLUNTARY MANSLAUGHTER

Defendant claims that the trial court erred in failing to give a sua sponte instruction on the lesser included offense of attempted voluntary manslaughter.[5]

### A. *STANDARD OF REVIEW*

#### 1. Sua Sponte Duty to Instruct on Lesser Included Offense Instruction

Trial courts must instruct on all theories of a lesser included offense when the evidence raises a question as to whether all of the elements of the charged offense were present. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*).) But, the court " 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215 (*Cole*) quoting *People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

In deciding whether evidence is "substantial," we only determine its bare legal sufficiency, not its weight. (*Breverman*, *supra*, 19 Cal.4th at p. 177.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations]." (*Id.* at p. 162, original italics.)

That evidence must also support the lesser-included instruction (i.e., there must be substantial evidence from which a reasonable jury could conclude that the lesser offense was committed, but not the greater offense). (*Breverman*, *supra*, 19 Cal.4th at p. 162; *People v. Memro* (1995) 11 Cal.4th 786, 871 (*Memro*), overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172.)

---

[5] Defendant has not raised any claim of error with respect to instruction on perfect self-defense.

We independently review the omission of an instruction on a lesser-included offense. (*Cole*, *supra*, 33 Cal.4th at p. 1215.) As set forth above, our inquiry is whether evidence was adduced at trial that was both (1) substantial enough to merit consideration by the jury and (2) supportive of the lesser included offense but not the greater offense. To further define our standard of review with respect to the second prong, we will briefly explore the interaction between the doctrines of malice, intent, and accomplice liability in the context of an attempted homicide.

### 2. <u>Mitigation of an Accomplice's Malice</u>

Attempted murder is the attempt to commit an unlawful killing of a human being, with malice aforethought. (*People v. Williams* (1988) 199 Cal.App.3d 469, 475.) Here, defendant was tried as an aider and abettor to attempted murder.[6] Aiding and abetting attempted murder has two components: (1) an act or omission and (2) a necessary mental state. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) That is, the accomplice to attempted murder must act "with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing …." (*People v. Lee* (2003) 31 Cal.4th 613, 624.) These intent requirements are outgrowths of the legal principle that only the perpetrator's acts are imputed to the aider and abettor, not the perpetrator's mens rea. (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)

Like attempted murder, attempted manslaughter is also committed with intent to kill, but without malice. (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251.) Attempted

---

[6] At closing argument, the prosecutor stated: "Now, from the very beginning we have always mentioned there was this individual Pedro, the defendant's brother, and we always said Pedro was the individual with the machete, and during voir dire we discussed this aiding and abetting theory. That's the theory by which we are operating with respect to this defendant." Later, she stated: "Now we get to the attempted murder charge. And again, we've always said that Pedro was the one with the machete and that his brother is the one that [*sic*] helped him commit this crime."

voluntary manslaughter is a lesser-included offense of attempted murder. (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1545 (*Montes*).)

"Imperfect self-defense" or "heat of passion" will mitigate attempted murder to attempted voluntary manslaughter. (*McCoy*, *supra*, 25 Cal.4th at 1116 citing *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.) Imperfect self-defense applies where a defendant actually but unreasonably believes in the need for self-defense. "Heat of passion" applies where the reason of a strongly impassioned defendant is actually obscured by the victim's provocation, which must be sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (*Montes*, *supra*, 112 Cal.App.4th at p. 1549 quoting *People v. Lasko* (2000) 23 Cal.4th 101, 107-110.)

These doctrines can apply independently to the actors involved. For example, imperfect self-defense may apply to a direct perpetrator and not the aider and abettor. (*McCoy*, *supra*, 25 Cal.4th at pp. 1118-1120.) In such a case, the perpetrator can be found guilty of manslaughter while his accomplice is guilty of murder. (*Id*. at pp. 1121-1122.) This is because " ' " 'the individual *mentes reae* or levels of guilt of the joint participants [in a crime] are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt … will necessarily be different as well.' " ' [Citations.]". (*People v. Concha* (2009) 47 Cal.4th 653, 662.)

Distilling these principles leaves us with the following question: was there substantial evidence that defendant himself acted in heat of passion or imperfect self-defense, regardless of Pedro's mental state? We conclude, *post*, that there was not sufficient evidence to support such an instruction.

*B.  THERE WAS NOT SUBSTANTIAL EVIDENCE SUPPORTING AN INSTRUCTION ON AN "IMPERFECT" SELF-DEFENSE THEORY OF ATTEMPTED VOLUNTARY MANSLAUGHTER*

1.  The Evidence Does Not Support an Attempted Voluntary Manslaughter Instruction

To trigger a sua sponte duty to instruct, there must be substantial evidence from which a reasonable jury could conclude that (1) the lesser offense was committed and (2) the greater offense was not committed.  (See *Breverman*, *supra*, 19 Cal.4th at p. 162; *Memro*, *supra*, 11 Cal.4th at p. 871.)  This test is not satisfied here.

According to defendant, he was standing next to a vehicle getting ready to leave when Ramirez exited the bakery and attacked him.  Defendant tried to cover himself for protection.  Defendant could not defend himself because Ramirez dropped the defendant to the ground and started kicking him.  Defendant grabbed Ramirez's legs to stop the kicking, and Ramirez fell on top of him.  At some point, defendant's brother, Pedro, arrived.  Defendant did not see Pedro arrive and did not speak to him.  Defendant did not know whether Pedro had anything in his hands because defendant was on the ground.  The fight ended as defendant got up, and he and Pedro left.  Defendant "think[s]" he did not hit Ramirez.  Ramirez had tried to fight defendant in the past.  Defendant did not fight with Ramirez because he is "scared of him."

Unfortunately for defendant, this evidence "proves" too much.  Defendant's testimony does not support the lesser-included offense of aiding and abetting attempted voluntary manslaughter.  If anything, it supports instruction on "perfect" self-defense.

Perfect self-defense is present where (1) the defendant actually believes in the need to defend himself against imminent great bodily injury and (2) that belief is objectively reasonable.  (*People v. Jaspar* (2002) 98 Cal.App.4th 99, 106.)  If the jury had believed Ramirez started the fight unprovoked, dropped defendant to the ground and kicked him while defendant attempted to protect himself, then defendant's fear of imminent peril would have been objectively reasonable.  In other words, this testimony

12.

(if the jury had believed it) suggests that defendant committed neither attempted murder *nor attempted voluntary manslaughter*.[7]  And when "the defendant's version of events, if believed, establishes actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the instruction.  [Citation.]"  (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1232 quoting *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 934.)

### C. THERE WAS NOT SUBSTANTIAL EVIDENCE SUPPORTING AN INSTRUCTION ON A "HEAT OF PASSION" THEORY OF ATTEMPTED VOLUNTARY MANSLAUGHTER

Defendant also claims the court erred in omitting instruction on a "heat of passion" theory of attempted voluntary manslaughter.

A "heat of passion" theory of manslaughter has subjective and objective elements. (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)

#### 1.  Objective Requirement

To satisfy the objective element, the provocation must be of the kind that would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  (*Moye*, *supra*, 47 Cal.4th at p. 550.)  For malice to be negated on a heat of

---

[7] Moreover, defendant's evidence, if believed, would tend to negate the requisite intent for aiding and abetting liability.  An aider and abettor is one who acts " 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.  [Citation.]" (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1581, original italics; CALJIC 3.01.) Defendant testified that he did not see Pedro arrive during the fight, nor did he speak to him.  While the prosecution argued defendant held Ramirez down, defendant testified that he held Ramirez's legs to prevent Ramirez from hitting him.  Defendant testified he did not see anything in Pedro's hands.  When asked, "[W]hat did your brother do?" Defendant testified:  "Well, since I was on the ground I didn't know, really, what happened there because I was on the ground."  This is evidence which, if believed, tends to show lack of intent to aid, promote, encourage or instigate a crime. (See CALJIC 3.01.)

passion theory, the passion must be of the type " 'naturally … aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,…' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 (*Steele*).)

Defendant argues that Ramirez "rush[ing]" out of the bakery "visibly agitated" could cause defendant to become impassioned, "given their past history."  Simply seeing a person exit a building in an agitated state would not " 'arouse the passions of the ordinarily reasonable [person].' [Citation.]" (*Steele, supra*, 27 Cal.4th at pp. 1252-1253.)  Even if Ramirez's conduct had risen to the level of assault, it would still not constitute provocation necessary to support a voluntary manslaughter instruction.  (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 citing *People v. Elmore* (1914) 167 Cal. 205, 211, overruled on other grounds as stated in *People v. Camargo* (1955) 30 Cal.App.2d 543.)

### 2.  Subjective Requirement

To satisfy the subjective element, the defendant must have acted while *actually* under the influence of a strong passion induced by sufficient provocation.  (*Moye, supra*, 47 Cal.4th at p. 550.)

Even if there had been evidence satisfying the objective requirement, there was no substantial evidence supporting the subjective prong.  On this issue, defendant argues that he was not required to testify that he was acting in the heat of passion.  That is true, if it is established by other evidence.  But, to trigger a sua sponte duty to instruct on heat of passion, both provocation *and* heat of passion must be *affirmatively* shown.  (Cf. *Steele, supra*, 27 Cal.4th at p. 1252.)  "It is not enough that provocation alone be demonstrated. There must also be evidence from which it can be inferred that the defendant's reason was in fact obscured by passion at the time of the act. [Citations.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 719 overruled on other grounds by *People v. Flannel* (1979) 25 Cal.3d 668 and *Breverman, supra*, 19 Cal.4th 142.)  Here, there was no evidence that defendant actually, subjectively acted under the heat of passion.  (Cf. *People v.*

14.

*Manriquez* (2005) 37 Cal.4th 547, 585; *Steele*, *supra*, 27 Cal.4th at p. 1252.) In such cases, the trial court need not instruct on a heat of passion theory. (Cf. *Steele*, *supra*, 27 Cal.4th at pp. 1253-1254.)

### a. When Thrust of Defendant's Testimony is Self-Defense, Trial Court Need Not Instruct on "Heat of Passion"

In *Moye*, *supra*, 47 Cal.4th 537, the California Supreme Court dealt with a circumstance in which the defendant testified to his own state of mind. There, as here, the thrust of the defendant's testimony suggested a potential self-defense claim. Accordingly, the *Moye* trial court instructed the jury on imperfect self-defense. (*Moye*, *supra*, 47 Cal.4th at p. 550.) On appeal, the defendant argued that the trial court should have also instructed on "heat of passion." The defendant had testified that the victim attacked him with a bat, but the defendant was able to wrest the bat away. The defendant then hit the victim each time the victim approached him until the victim fell to the ground. The defendant testified he was not "in the right state of mind," when he killed the victim. Nonetheless, the Supreme Court held that the "thrust" of the defendant's testimony went to self-defense, not heat of passion. (*Id.* at pp. 552-553.)

> "In short, the thrust of defendant's testimony below was self-defense .… There was insubstantial evidence at the close of the evidentiary phase to establish that defendant 'actually, subjectively, kill[ed] under the heat of passion.' [Citations.] The only testimonial evidence on the point, substantial or otherwise, came from defendant himself given his decision to take the stand and testify in his own defense. His only claim was that he acted out of self-defense .…" (*Id.* at p. 554.)

The *Moye* court held that instruction on a sudden quarrel/heat of passion theory of voluntary manslaughter was not required. (*Moye*, *supra*, 47 Cal.4th at p. 553.) Likewise, the trial court was not required to instruct on heat of passion here.

### D. PEDRO'S STATE OF MIND

Defendant argues that Pedro's state of mind is relevant because both he and Pedro had to share intent to kill "with malice." Our Supreme Court's decision in *McCoy*, *supra*,

25 Cal.4th 1111 compels the opposite conclusion. Pedro need not have acted with malice for defendant to be convicted of attempted murder. *McCoy* is clear that perpetrators can act without malice (e.g., imperfect self-defense) while their accomplices act with malice. (*McCoy*, *supra*, 25 Cal.4th at p. 1122.) Thus, whether Pedro acted in the heat of passion, in imperfect self-defense, or with malice is irrelevant here. By extension, any evidence that Pedro's lacked malice could be consistent with defendant committing *either* the greater offense (i.e., attempted murder) *or the lesser-included offense* (i.e., attempted voluntary manslaughter). (See generally, *McCoy*, *supra*, 25 Cal.4th at p. 1111.) Put another way, any evidence that Pedro acted under heat of passion or in imperfect self-defense would not be " 'evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser*. [Citations.]" (*Memro*, *supra*, 11 Cal.4th at p. 871, original italics.)

## IV.

## SUBSTANTIAL EVIDENCE SUPPORTED VERDICT

Defendant argues that there was insufficient evidence to support the "intent to kill" requirement of attempted murder.

### A. STANDARD OF REVIEW

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805 quoting *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

16.

## B. *SUBSTANTIAL EVIDENCE SUPPORTED FINDING OF INTENT TO KILL*

Substantial evidence supports the jury's verdict here. Based on the telephone call Ramirez overheard, the jury could have reasonably inferred that defendant called Pedro intending that they would jointly attack Ramirez. There was evidence that Pedro hit Ramirez repeatedly with a machete, including at least once in the head. There was evidence that defendant continued to hold and kick Ramirez after Pedro had begun slashing at him with the machete. And, there was evidence that defendant verbally encouraged Pedro, saying "F**k him up, f**k him up." From this, the jury could have reasonably concluded that defendant aided and abetted Pedro with malice.

## C. *DEFENDANT'S ARGUMENTS TO THE CONTRARY ARE UNAVAILING*

### 1. Lack of Evidence Regarding "Interruption"

First, defendant argues that the victim's assailants voluntarily stopped short of killing without interruption. But, "when … [a suspect's] acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is under way, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him." (*People v. Dillon* (1983) 34 Cal.3d 441, 455, overruled on another point by *People v. Chun* (2009) 45 Cal.4th 1172.)

Moreover, Ramirez testified that he lost consciousness. The jury could have reasonably believed the prosecutor's argument that defendant and Pedro ceased their attack because they believed they had actualized their intent of killing Ramirez.

### 2. Knowledge That Pedro Would Arrive

Second, defendant argues that *he* did not demonstrate that he had knowledge that Pedro was arriving at the scene of the confrontation. But, the jurors were free to infer that knowledge from evidence other than defendant's testimony. So, while it is true that defendant himself did not indicate he knew Pedro would arrive, other evidence did suggest such knowledge. Ramirez testified that he heard defendant on a cellular telephone say, "Hey brother, um, he's here." The jury may have reasonably inferred that

defendant knew Pedro was coming, even though defendant's testimony did not demonstrate that knowledge.

Even a complete lack of evidence that defendant knew Pedro would be arriving at the bakery would not be dispositive. Defendant could have been completely surprised by Pedro's arrival yet still aided and abetted him once he arrived. "A person may aid and abet a criminal offense without having agreed to do so prior to the act.… Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532.)

### 3. Evidence Defendant Acted in Self-Defense

Third, defendant argues that the nature and extent of his injuries support his assertion that he held onto Ramirez's legs to prevent Ramirez from kicking him. When considering a claim of insufficient evidence, we do not look to whether there was substantial evidence supporting the defense's case or a component thereof. Reversing a guilty verdict on that basis alone would be a massive intrusion into the jury's exclusive province to determine truth or falsity. (Cf. *People v. Jones* (1990) 51 Cal.3d 294, 314.) That is why we review the entire record *in the light most favorable to the judgment* to determine whether there was sufficient substantial evidence to support *the verdict*. (*People v. Wilson*, *supra*, 186 Cal.App.4th at p. 805.)

Jurors were free to accept or reject defendant's urged interpretation of his injuries, so long as substantial evidence supported whatever conclusion they ultimately reached. Here, the jury apparently exercised that freedom by largely (or completely) rejecting defendant's proposed inferences. The jury's conclusion was supported by sufficient evidence. "That a contrary conclusion might also [have been] reasonable does not compel reversal of the conviction." (*People v. Kraft* (2000) 23 Cal.4th 978, 1058 citing *People v. Thomas* (1992) 2 Cal.4th 489, 514 disagreed with on other grounds by *Thomas v. Chappell* (2012) 678 F.3d 1086. See also *People v. Borrego* (1931) 211 Cal. 759, 765

[conflict between a defendant's testimony and circumstantial evidence does not warrant reversal where the latter sufficiently supports the verdict].)

### 4. Evidence of Intent to Kill

Fourth, defendant argues that the intent to injure and the intent to kill are not equivalent. That is true, but the two intents are not mutually exclusive either. Therefore, the jury was free to conclude that defendant harbored neither, one or both types of intent. By convicting defendant of attempted murder, the jury necessarily concluded defendant intended to aid and abet Pedro's attempted murder. Because sufficient evidence supported that conclusion, our inquiry ends.

### 5. Credibility and Weight of Ramirez's Testimony

Fifth, defendant argues in his reply brief that Ramirez exaggerated his testimony and that his account of events "changed." Even if Ramirez's testimony had been self-contradictory, it could nonetheless support a guilty verdict. (See *People v. Shirley* (1982) 31 Cal.3d 18, 70, superseded by statute on other grounds as stated in *Franklin v. Fox* (N.D. Cal. 2000) 107 F.Supp.2d 1154.) It is for a jury to determine the weight of testimony. (See *People v. Ashley* (1954) 42 Cal.2d 246, 266.) There is no reason to disturb the jury's determinations here.

**DISPOSITION**

The judgment is affirmed.

19.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.

20.